(C. D. 1247)

Wm. J. Jones & Co. v. United States

United States Customs Court, Third Division

(Decided May 31, 1950)

*Altschuler & Morrison* (*Benjamin M. Altschuler* of counsel) for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*Samuel D. Spector, Dorothy C. Bennett, Richard H. Welsh*, and *Richard E. FitzGibbon*, special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges; EKWALL, J., dissenting

JOHNSON, Judge: This action involves the assessment of duty upon 35 bales of hops out of a shipment from Trieste, Yugoslavia, of 200 bales, entered for warehouse at the port of Philadelphia on January 4, 1946. A warehouse withdrawal for consumption of the entire 200 bales was filed on January 9, 1946, and the goods were released to the agent of the importer without having been placed in a bonded warehouse. The hops were shipped by rail to the Anheuser-Busch Brewing Co. of St. Louis, Mo.

It is claimed in the protest that due to a casualty at sea 35 bales became contaminated with oil during the voyage of importation and that the said bales arrived in the United States in a commercially worthless condition; that the hops contained in said bales were unfit for food and constituted a prohibited importation; that allowance should have been made under the provisions of section 558 of the Tariff Act of 1930, as amended. Alternatively, it is claimed further that the 35 bales should have been treated as a nonimportation and no duty assessed thereon.

At the trial the official papers forwarded to the court with the protest were received in evidence by consent of counsel. The 7 witnesses testifying for the plaintiff also produced 12 documentary exhibits. The vessel arrived in the United States at the port of Philadelphia on December 31, 1945. The discharging inspector's return, dated January 15, 1946, shows 35 bales of hops as "stained" when unladen from the vessel, the listed numbers of the bales agreeing with the bales in question herein. None of the 35 bales were included among those examined by the appraiser on January 7, 1946. The entry

papers also disclose that the warehouse entry was dated January 4, 1946, and on January 9, 1946, a warehouse withdrawal for consumption was filed and the entire 200 bales of hops were released from customs custody. The Reading Railroad, on January 11, 1946, issued a receipt for the hops for transshipment to the Anheuser-Busch Brewing Co. in St. Louis, Mo. They were received by the railroad as being in apparent good order except that 35 bales were stained with oil and 1 bale torn. There is no indication that the Food and Drug Administration had knowledge of the condition of these bales and no samples were required by that branch of the Government.

The pier superintendent testified that while the bales were being unladen he discussed the stained bales with the chief officer of the importing vessel who stated in explanation, "we must have had an oil leak," and later on the next day the superintendent saw a dark stain on the floor of the vessel in the number 4 hatch from which the bales were unladen, but he made no report of it. The customs broker paid the duties due, withdrew all of the hops for consumption, and arranged to have them shipped by rail to the Anheuser-Busch Brewing Co. of St. Louis, Mo. The said brewing company had no part in the importation of the hops, having purchased them in this country. The customs broker testified that at the time he withdrew the hops he had no knowledge that any of the bales were damaged. He first became aware of the damage when he received the bill of lading from the railroad company and saw the exceptions noted thereon.

The railroad car which contained all of the stained bales also contained six additional bales as to which no claim is made. The railroad car arrived in East St. Louis on or about January 20, 1946. An employee of Anheuser-Busch Brewing Co., together with a laboratory technician, had the car seals broken for unlading. At that time they noticed the stained bales and the strong odor of kerosene-like oil. Samples were taken and sent to the company laboratory for testing. Then the bales were reloaded into the car and the car was resealed and reconsigned to St. Louis to the company's own tracks for a thorough inspection.

On January 25, 1946, the car was again opened and unladen at the company plant. The chief chemist of the brewing laboratory directed that the bales be opened, and a sample measuring 2½ feet square of the inner lining was removed in order to extract the oil from it. It was found to contain about 2 ounces.

The chemist further testified that the hops were compressed into an inner lining of linen and then wrapped in a very heavy burlap outer lining. At the time that the bales were unloaded upon the Anheuser-Busch warehouse platform, it was found that 41 bales were stained. There had been 41 bales in the railroad car including the 35 bales claimed to be damaged upon arrival in the United States. There is no

claim here as to the six extra bales found to be stained. Five or six samples were taken from the bales for further testing. When the car was opened in the presence of the chief chemist, he detected a very strong kerosene odor and was of the opinion that the hops would absorb the odor of the oil so that it would be impossible to use them. In order to determine whether or not the hops were usable in brewing operations, he caused an extract of the hops to be made from a sample. However it was found that the extract carried a very strong odor of kerosene. Consequently, the chief chemist determined that none of the hops could be used in brewing and recommended that the entire shipment be rejected.

A cargo surveyor testified that he was requested by an insurance company to make a survey, first at St. Louis, where he examined the exterior of every bale and found them all oil-stained, a number of the bales having the stain on only one or two sides. The witness stated that the inner linen lining acted as a wick and had drawn the oil completely around the surface of the hops, and upon the testing of five bales, it was discovered that the oil had penetrated the entire contents. The surveyor again saw the hops in February 1946 in New York in a marine salvage warehouse. There, the covers were stripped off and the discolored hops removed. Attempts were made to obtain bids on the portion of hops which were not oil-stained but the witness was unsuccessful in obtaining any bids. Consequently, he recommended that the broker apply to the collector for abandonment of the merchandise.

The salvage warehouseman testified that the salvage report was based upon the examination of five bales; that the salvaged material although not oil-soaked did have an oil odor; that four offers were made to sell the goods, two to breweries, one to a feed concern, and one to a dealer in oils, but no bids were received for the merchandise. In making offers for sale, the witness was not prohibited by any Government agency from attempting to sell the goods.

The claims secretary of the insurance company testified that his company insured the shipment of hops; that on January 22, 1946, he received advice that the hops were rejected by Anheuser-Busch on account of oil damage.

The official papers disclose that the collector of customs at the port of Philadelphia, at the importer's request, asked the collector at New York to supervise the destruction of the contaminated hops, and that they were destroyed under the supervision of the collector at the port of New York.

Exhibit 13 of plaintiff's exhibits is a photostatic copy of one page of the ship's log for the importing vessel's voyage from December 19, 1945, to January 2, 1946, when these hops were aboard the vessel. Said page covers Thursday, December 27, 1945, and reads as follows:

Due to heavy rolling of vessel, drums of engine oil #4 T/D adrift and punctured, contents probably damaging cargo. Drums relashed and reshored and steps taken to prevent further damage.

Counsel for the plaintiff contends that upon arrival of the 35 bales of hops they were in a wholly commercially worthless condition and therefore should be treated as a nonimportation rather than dutiable merchandise, citing *Lawder* v. *Stone, Collector*, 187 U. S. 281; *Marriott* v. *Brune*, 9 How. 619; *United States* v. *Shallus*, 2 Ct. Cust. Appls. 332, T. D. 32074, etc. It is further contended that as the hops arrived in an adulterated condition and wholly unfit for food, the importation was prohibited under the pure food laws of the United States, and when duties have been paid upon prohibited merchandise which has been entered in good faith and subsequently destroyed in accordance with law and the regulations, the duties collected thereon may be refunded, even though the hops were originally released from customs custody, citing *American Express Company* v. *United States*, 21 Cust. Ct. 42, C. D. 1124; *Kroger Grocery & Baking Co.* v. *United States*, 14 Cust. Ct. 59, C. D. 911; and *Boston Brokerage Co.* v. *United States*, 22 C. C. P. A. 461, T. D. 47454.

As to the prohibited merchandise claim, there is no evidence before the court that the goods were ever prohibited by any agency of the Government. On the other hand, the evidence shows that no prohibition order was ever issued. The goods were accepted for entry, a delivery permit for consumption was issued by the customs officials, and the sale of the goods had never been prohibited. In all of the cases cited by plaintiff's counsel, the goods had been declared prohibited by a department of the Government and "subsequently exported or destroyed pursuant to a law of the United States under such regulations as the Secretary of the Treasury may prescribe." (Section 558 (a) (2), Tariff Act of 1930, as amended.) Therefore the cases cited are not in point. We find no merit in such claim.

Reviewing the evidence wherein counsel for the plaintiff has attempted to establish that the goods were so far destroyed at the time of importation that their condition amounts to a nonimportation, the discharging inspector reported 35 bales to be "stained" when unladen. The bales were not opened to determine whether or not there was any damage to the hops. A dark stain was found on the floor of the number 4 hatch where the bales in question were stored. A ship's officer conjectured that there must have been an oil leak. No further evidence was adduced relative to the condition of the merchandise at the time of unlading.

Five days after unlading, the hops were withdrawn from customs custody at the port of Philadelphia and shipped to the port of St. Louis, arriving there 11 days later. The contents of the bales were not formally inspected by the purchaser and user thereof until 3 weeks

after importation, when the 35 bales of hops in question were rejected as worthless for use in the brewing of beer. Nor was there any formal application for destruction of the goods made until almost 6 months after importation and more than 30 days after release from customs custody. The foregoing is the sum and substance of the evidence upon which counsel for the importer relies to establish that the hops at the time of importation were in a worthless condition such as would amount to a nonimportation. We are unable to find from the record that there was any evidence presented sufficient to establish that, at the time of unlading, the contents of these 35 bales had been destroyed by being saturated with oil fumes so as to be in a worthless condition.

True, it is, that 35 bales were noted as being oil-stained. This court, however, under the law, may not reach its conclusions upon such presumptive evidence alone, nor through mere conjecture. The importer, in classification cases, may present evidence in an effort to overcome the presumption of correctness of the action of the collector. Not only should an importer establish that the action of the collector was erroneous, but also it is required that positive evidence be presented to substantiate the claims made, which certainly has not been done in the case at bar. See *United States* v. *Frank P. Dow Co., Inc.*, 17 C. C. P. A. 455, T. D. 43915.

All the court has before it in this case is a mere inference—a probable conclusion toward which known facts, statements, or admissions point—but which does not establish that the hops within the bales were so far destroyed at the point of unlading that such destruction amounted to a nonimportation of the goods. The court may order the collector to refund the duties collected only when the importer has established by a preponderance of evidence that the merchandise was so far destroyed at the time of unlading that such destruction amounted to a nonimportation. A fair inference from the evidence adduced that the bales upon unlading might have been contaminated with oil is not sufficient to establish that the goods were not merchantable at that time.

Section 558 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, prohibits refund of estimated or liquidated duties on merchandise because of exportation or destruction after its release from customs custody unless it is within a prohibited class of imports. Hops are not a prohibited class of imports and no adulteration proceedings were instituted by the Government against the importation herein. In fact, the statute directly prohibits a refund in duties. It reads as follows:

SEC. 558. NO REMISSION OR REFUND AFTER RELEASE OF MERCHANDISE.

\* \* \* \* \* \* \*

(b) *When articles are* exported or *destroyed under customs supervision after once having been released from customs custody,* as provided for in section (c) of section

304 of this Act, *such* exportation or *destruction shall not exempt such articles from the payment of duties* other than the marking duty provided for in such subsection (c). [Italics not quoted.]

It will be noted that the foregoing section does not exempt such destroyed articles from the payment of duty when the destruction occurred after release from customs supervision. The court may not assume, because of the nature of the oil purported to have destroyed the merchandise, that the hops were unfit for use on arrival in this country. Inasmuch as the evidence before the court clearly fails to establish that the hops were worthless at the time of importation, it is the holding of the court that any refund of the liquidated duties is prohibited under the provisions of section 558 (b). Judgment will therefore be entered in favor of the Government.

### DISSENTING OPINION

Ekwall, Judge: I agree with the majority opinion insofar as it holds that the hops here involved did not constitute prohibited merchandise under the statute (section 558 of the Tariff Act of 1930, as amended) for which allowance should have been made. However, I am unable to agree that the evidence is insufficient to establish that the 35 bales of hops arrived in the United States in a worthless condition so as to constitute them a nonimportation. It is noted that the importing vessel carried no cargo other than the 200 bales of hops. It is true that some length of time elapsed between the date of arrival of the hops in this country and the date upon which they arrived at St. Louis, where they were shown to be worthless, but in view of the chain of evidence produced on behalf of the importer as to the oil leak which occurred on the importing vessel during the voyage while the vessel was hundreds of miles at sea, the fact that these 35 bales were stained upon their discharge from the vessel, and that one witness testified to seeing an oil-like stain on the floor of the ship at number 4 hatch, the day following the discharge of the cargo, it is my opinion that the evidence is more than sufficient to show that the hops in these 35 bales were so impregnated with oil or the odor of oil upon their arrival in this country as to be entirely worthless. The evidence shows that the only cargo carried by the importing vessel consisted of hops; that these 35 bales were stained upon being unladen; that a casualty occurred wherein certain drums of petroleum-type engine oil became adrift and were punctured while the vessel was a considerable number of miles at sea; and that the incident was of sufficient moment to become the subject of a ship's log entry to the effect that the contents of the punctured drums probably damaged the cargo. I think the inference from these proven facts is crystal clear that due to the nature of the engine oil used by the importing vessel,

which very plainly had stained these 35 bales, said oil and the fumes therefrom had permeated the contents of the 35 bales and rendered them worthless prior to their arrival in this country so as to constitute them a nonimportation. This is amply borne out by the testimony to the effect that the inner linen covering of the bales acted as a wick to draw the oil completely around the surface of the hops. Unquestionably, this result followed almost immediately after contact with the oil. Since the testimony indicates that hops are used commercially only for flavoring of beer or ale, which is a food use, the permeation of these hops by said oil or oil fumes, to my mind, rendered them wholly worthless.

To reject a chain of evidence so cogent as that produced on behalf of the importer in this case would be tantamount to requiring a plaintiff to prove his case by stronger evidence even than required in most jurisdictions in a criminal case—beyond a reasonable doubt and to a moral certainty. This would not be reasonable or practicable and I do not believe that the law requires any such yardstick. When related testimony is forged link by link, as in this case, until it points unerringly to the conclusion that goods must have been so contaminated on arrival in this country as to be entirely worthless, it seems to me that the demands of the law have been more than sufficiently met. To go beyond such a requirement would, to my mind, result in a practical denial of justice, in many cases.

I therefore think that the claim of the plaintiff that at the time of unlading the bales were so far destroyed as to constitute a nonimportation, should be sustained.